## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **David Johnson, Dennis Carnes, Ronald Humes, and Lori Owen, individually and on behalf of all others similarly situated,** ) ) ) ) | |
| ) | **CASE ACTION NO.:** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | **CLASS ACTION COMPLAINT** |
| **FCA US, LLC,** ) | |
| **a Delaware Limited Liability Co.,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **Defendant.** ) | |

---

## CLASS ACTION COMPLAINT AND JURY TRIAL DEMANDED

---

Plaintiffs, David Johnson, Dennis Carnes, Ronald Humes, and Lori Owen ("Plaintiffs"), bring this class action by and through the undersigned counsel, on behalf of themselves and all others similarly situated, against Defendant, FCA US, LLC ("Defendant" or "Chrysler"), and in support alleges, upon information and belief and based on the investigation to date of counsel, as follows:

## INTRODUCTION

Plaintiffs bring this action individually and on behalf of all persons similarly situated in the United States who purchased vehicles equipped with Side Airbag Inflatable Curtains (SABICs) that were manufactured, distributed, and/or sold by Chrysler between model years 2010 and 2017.

1.     SABICs are an integral part of a vehicle's occupant protection system and overall crashworthiness.

2.     Rollover crashes – in which a vehicle rolls onto its side or roof -- cause a disproportionate number of the injuries and fatalities attributed to motor vehicle accidents. While some rollovers involve one or more total revolutions of the vehicle, the majority of rollover crashes result in one or two quarter-turns, in which the vehicle rolls and stops on its side or roof.

3.     Ejection from the vehicle is a serious risk in all rollover crashes because the ejected occupant may suffer catastrophic injuries upon impact with the ground and fixed objects outside the vehicle or may be crushed by the vehicle itself.

4.     SABICs are designed to deploy in rollover crashes to prevent or mitigate injuries. A deployed SABIC protects vehicle occupants by providing a physical barrier that prevents total or partial ejection through a side window as the

1

vehicle rolls. Additionally, a deployed SABIC provides occupant protection inside the vehicle with a cushioning effect to prevent or reduce head injuries.

5.      Beginning in 2006 and through some point in 2017, Chrysler's SABIC deployment system was designed and programmed to activate under certain conditions, but not in all rollovers. If the sensors determined that a vehicle was moving into a slow developing rollover crash (SDRC), the SABICs would not deploy.

6.       Plaintiffs allege that the conditions resulting in a rollover of one or two quarter turns of the vehicle would be detected as an SDRC and therefore not trigger deployment of the SABICs under Chrysler's deployment logic. This means that Chrysler's SABIC/SDRC deployment logic suppresses SABIC deployment in the majority of the rollover crashes.

7.      On information and belief, Plaintiffs allege that by the time SABIC equipment became a standard feature in U.S. cars in 2011, all other auto manufacturers had programmed deployment to activate their SABICs in all rollovers.

8.      Chrysler's decision to suppress SABIC deployment in SDRCs denies occupants the safety benefits of SABIC technology in common and serious rollover crashes and increases the risk of death or injury to the occupants.

9.      In the promotional brochures and on window stickers that accompanied Chrysler vehicles, Chrysler described and depicted its SABIC system as standard equipment that was one safety component in a comprehensive crashworthiness and occupant protection system. Chrysler did not disclose to consumers the fact that the SABIC system was designed and programmed to not deploy under certain rollover conditions and the majority of rollover crashes. Nor did Chrysler disclose to customers the fact that its SABIC system differed in this material aspect from all of Chrysler's competitors.

10.      Plaintiffs bring this action for: violations of the federal Magnuson-Moss Warranty Act and of state statutes prohibiting deceptive and unfair acts in commerce; breach of express and implied warranties, and; for fraudulent concealment and unjust enrichment under state common law. Plaintiffs seek damages including punitive damages, in addition to equitable and declaratory relief, based upon the following allegations.

## **PARTIES**

11.      Plaintiff David Johnson is a citizen and resident of Henry County, Ohio. He is the owner of a 2015 Chrysler 300.

12.      Plaintiff Dennis Carnes is a citizen and resident of Erie County, Pennsylvania. He is the owner of a 2014 Dodge Caravan.

13.     Plaintiff Ronald Humes is a citizen and resident of Los Angeles County, California. He is the owner of a 2016 Chrysler 300C.

14.     Plaintiff Lori Owen is a citizen and resident of Bureau County, Illinois. She is the owner of a 2016 Jeep Cherokee.

15.     Defendant FCA US, LLC ("Defendant" or "Chrysler") manufactured Plaintiffs' vehicles. During the relevant time period, Chrysler also manufactured the following vehicles (the Class Vehicles) under the Chrysler brands: Chrysler Pacifica (mid 2016); Chrysler Pacifica Hybrid (2017); Chrysler 200 (2011-2017); Chrysler 300 (2010-2017); Chrysler 300C (2010-2017); Chrysler PT Cruiser (2010); Chrysler Sebring (2010-2012); Chrysler Town and Country (2010-2016); Dodge Avenger (2010-2014); Dodge Caliber (2010-2012); Dodge Challenger (2010-2017); Dodge Charger (2010-2017); Dodge Dart (2013-2016); Dodge Dakota (2010-2011); Dodge Durango (2011-2017); Dodge Grand Caravan (2010-2017); Dodge Journey (2010-2017); Dodge Nitro (2010-2011); Dodge Viper (2010, 2015-2017); Dodge SRT Viper (2013-2015); Jeep Commander (2010); Jeep Compass (2010-2017); Jeep Compass X (2017); Jeep New Compass (2017); Jeep Cherokee (2014-2017); Jeep Grand Cherokee (2010-2017); Jeep Liberty (2010-2012); Jeep Patriot (2010-2017); Jeep Patriot X (2017); Jeep Renegade (2015-2017).

16.     Defendant has restructured and changed names several times over the last 12 years:

   a.     Prior to April 30, 2009, Defendant was known as CHRYSLER, LLC.

   b.     On June 10, 2009, CHRYSLER, LLC sold substantially all of its assets to a newly formed company later known as CHRYSLER GROUP LLC. Pursuant to the sales transaction, CHRYSLER GROUP LLC assumes responsibility for safety recalls pursuant to the 49 USC Chapter 301 for vehicles that were manufactured and sold by CHRYSLER LLC prior to the June 10, 2009 asset sale.

   c.     On June 11, 2009, CHRYSLER LLC changed its name to OLD CARGO LLC. The assets of OLD CARGO LLC that were not purchased by CHRYSLER GROUP LLC as well as the liabilities of OLD CARGO LLC that were not assumed, remain under the jurisdiction of the United States Bankruptcy Court- Southern District of New York. (In re Old Cargo, LLC et al , Case No. 09-50002.00)

   d.     Effective December 15, 2014, CHRYSLER GROUP LLC changed its name to FCA US LLC (FCA US).

e. Effective January 16, 2021, FCA US LLC changed its name to Stellantis LLC.

f. The legal title of the manufacturers of the Class Vehicles as described herein appears to be CHRYSLER GROUP LLC and FCA US LLC.

g. Throughout these changes, Defendant has had or has continued to use Auburn Hills, Michigan as its principal place of business.

h. At all times, relative to the allegations of this Complaint, the various corporate and business entities described above, have produced vehicles under the Chrysler, Dodge, and Jeep brands. For simplicity purposes, the manufacturers of the Class Vehicles shall be collectively referred to as Chrysler.

## **JURISDICTION AND VENUE**

17. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d) because members of the proposed Class are citizens of states different from Defendant's home state and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and cost.

18. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because Defendant conducts substantial business in this District and has caused harm to Members of the Class who reside in this District.

19.     The claims herein are related to vehicles manufactured by Chrysler between MY2010 and MY2017 and are not subject to the jurisdiction of the U.S. Bankruptcy Court for the Southern District of New York (In re: Old Cargo, LLC et al., Case No. 09-50002.00).

## TECHNICAL TERMS AND THEIR ACRONYMS

20.     SABIC is an industry acronym that stands for "side airbag inflatable curtains."

21.     SDRC is an acronym that stands for "slow developing rollover crash."

22.     "Deployment logic" means the programming used to recognize the conditions under which the airbag deployment will occur.

23.     Occupant Restraint Controller (ORC) is the command center of the occupant restraint system, which includes safety-belt pretensioners, front and side airbags, and SABICs. The ORC includes, among other things, a roll-rate sensor and other sensors that measure the vehicle's roll-rate and Y- and Z- axis acceleration, enabling the ORC to anticipate a rollover and command SABIC deployment under the criteria captured in the vehicle's deployment logic.

## FACTUAL ALLEGATIONS

24.     Auto manufacturers began development of SABICs in the late 1990s.

25.     SABICs were first installed in production vehicles by Ford Motor Company in 2002.

7

26.     SABICs are one safety component of the occupant restraint system – which is designed to protect vehicle occupants in the event of a crash. Other components include safety-belts, pretensioners, and front and side airbags. Each of these components is designed to deploy and provide protection in a crash.  With the exception of safety-belts, each component is supposed to work without any action by the vehicle occupant.

27.     SABICs are designed to deploy in a rollover crash. Most commonly a crash impact precedes the rollover – *e.g.*, a vehicle is hit from the side or rear or a vehicle crashes into an obstacle – but that is not always the case. Vehicles traveling at higher speeds, hard-braking or maneuvering, or traveling on slick or uneven roads – all of which are normal, foreseeable driving patterns -- may also roll. Deployment is triggered by sensors that compute the roll-rate and read the Y- and Z-axis accelerometers to detect anomalies in the vehicle's motion.

28.     SABICs are stored in the roof rail area above each side window of the vehicle. Upon deployment, SABICs will launch downward to the base of the windowsill and should remain inflated for up to 5 seconds, creating a physical barrier in the window opening to prevent or mitigate partial or total occupant ejection in the rollover.

29.     SABICs may also mitigate occupant head injuries by preventing or minimizing contact with structural elements of the vehicle or other hard objects

during the rollover. In most vehicles, SABICs provide the primary head injury protection (cushioning) of occupants involved in a rollover crash.

### *Because Safety Sells, Chrysler Sold Safety*

30.     Chrysler has long promoted the safety of its vehicles and its airbag systems as providing complete, comprehensive protection. For example:

      a.     Safety in the 2012 Jeep Compass was promoted as "Advanced multistage front and side-curtain air bags. These air bags provide nearly instantaneous occupant protection by matching air bag output to crash severity."

      b.     The promotion brochure for the 2012 Jeep Grand Cherokee promised "A SAFE, SECURE AIR BAG SYSTEM. Always standard: full-length side-curtain, seat-mounted side thorax, and advanced multistage front air bags all work in tandem to help provide protection."

      c.     The 2021 Dodge Grand Caravan was promoted for "[h]igh-grade safety and security features." These included "SEVEN STANDARD AIRBAGS" that Chrysler described as "Standard side-curtain airbags and standard front-seat mounted airbags deploy, blanketing outboard positions in all three rows of seating."

d.     The 2012 Dodge Durango promotion brochure featured a full page on SAFETY features, promoting full length, side-curtain airbags -- along with advanced multistage front air bags and front-seat mounted side-thorax airbags -- as standard equipment.

e.     The 2012 Chrysler Town & Country was promoted as "A minivan that offers an advanced safety and technology package like no other in its class" with "Forty-two available active and passive safety and technology features" including "supplemental side curtain airbags [that] extend protection to all outboard front- and rear-seat passengers, including third-row outboard passengers. Upon side impact, the system deploys the specific side airbag required for occupant protection."

31.     Window stickers affixed to Chrysler vehicles during the Class Period also listed the SABIC as standard equipment:

a.     The 2016 Jeep Grand Cherokee listed "Safety" features including "dual stage driver and passenger seat-mounted side airbags", "dual stage driver and passenger front airbags", "curtain first and second row airbags" and an "airbag occupancy sensor";

b.  the 2017 Jeep Grand Cherokee listed "Safety" features including "dual stage driver and passenger seat-mounted side airbags", "dual stage driver and passenger front airbags", "curtain first and second row airbags" and an "airbag occupancy sensor";

c.  the 2015 Chrysler 300 listed "Functional/Safety Features" including "advanced multistage front airbags", "supplemental side-curtain front and rear airbags", "supplemental front seat-mounted side airbags";

d.  the 2016 Chrysler 300 listed "Functional/Safety Features" including "advanced multistage front airbags", "supplemental side-curtain front and rear airbags", "supplemental front seat-mounted side airbags";

e.  the 2013 Dodge Journey listed standard "Safety" features including "Front advanced multi-stage airbags – inc: front passenger occupant sensor", "supplemental front side airbags", "supplemental front/rear side-curtain airbags";

f.  the 2014 Dodge Caravan listed standard "Safety" features including "dual stage driver and passenger seat-mounted side

11

airbags", "dual stage driver and passenger front airbags",

"curtain 1st, 2nd and 3rd row airbags"

32.     Nothing in these promotional materials advises consumers that the

SABIC system was programmed to *not* deploy in the majority of rollover crashes.

Nor did Chrysler provide a description or disclaimer explaining that Chrysler had

determined that some rollovers were not serious or severe events. Instead, SABICs

were promoted as standard equipment that would protect all occupants in crashes.

33.     This omission is particularly noticeable when contrasted with

Chrysler's description of its front airbags as "multistage" designed, which by 2010

were commonly understood to not deploy in very low-speed impacts and to adjust

airbag inflation pressure to crash severity in low-to-moderate and moderate-to-

severe crashes. Additionally, multistage airbags were programmed to deploy (or

suppress deployment) according to the weight of the passenger-side occupant and

safety-belt usage.

### SABIC Deployment Depends Upon The Programming Logic Set By The Vehicle Manufacturer

34.     Deployment of the SABICs is commanded by the vehicle's ORC

device which is typically located beneath the center console. ORCs sense vehicle

movement that will predict a rollover crash and command deployment of the

SABICs.

35.    Electronics manufacturers like Continental, TRW, Autoliv, and Bosch supply ORCs to automobile manufacturers like Chrysler. On information and belief, these electronics manufacturers ("the Suppliers") supplied ORCs to Chrysler over the relevant time period.

36.    While the Suppliers manufacture the ORCs, ORCs are built to the design and performance specifications set by the automobile manufacturer. Thus, the automobile manufacturer determines the conditions under which the SABICs should deploy and the component suppliers program the ORCs accordingly.

37.    The performance specifications are typically referred to as the "deployment strategy" of the auto maker.

38.    Auto manufacturers conduct developmental testing to confirm that the ORCs meet their performance specifications.

39.    Despite the fact that all rollover crashes are considered by the automobile industry as serious crashes and violent events, Chrysler elected to adopt a deployment strategy that would not deploy the SABICs in SDRCs.

40.    The decision by Chrysler to only deploy the SABIC in relatively faster occurring rollovers was inconsistent with the *de facto* industry standard that emerged even before manufacturers were required to install SABIC equipment in new vehicles. On information and belief, Plaintiffs allege that all other auto

manufacturers elected to adopt a Deployment Strategy that would deploy in *all* rollover crashes, including SDRCs.

41.    On information and belief, Plaintiffs allege that Chrysler based its decision on a belief that the risk of injury to out-of-position occupants – *i.e.*, occupants who are not upright, front-facing, and restrained -- in a SDRC would exceed the benefits that a deployed side curtain air bag would provide to mitigate partial or total ejection of occupants in a rollover and head injuries. On information and belief, this risk/benefit assessment decision was based upon Chrysler's theoretical assessment of deployment risk – not testing or real-world data -- and was contradicted by findings published by the National Highway Traffic Safety Administration (NHSTA) in 2007.

### Chrysler's SABIC Deployment Strategy Failed To Evolve As Evidence Showing The Importance Of Universal Deployment Developed

42.    The deployment injury potential of airbag technology was recognized by the auto industry as early as the late 1990s, when the deployment of front airbags in low speed crashes caused the deaths of several dozen children and small adults.  Regulators, engineers, and manufacturers quickly realized that front airbags needed to be calibrated to the severity of the crash triggering deployment – including no deployment in very low speed crashes and suppression of deployment depending on the weight and position of the occupant seated in the path of the

14

airbag. As a result, revisions to federal auto safety regulations, requiring multistage deployment of front airbags, were promulgated in the early 2000s.

43.     But different factors are involved in assessing the risks and benefits of SABICs. To compare the very high death and serious injury rate of ejected and partially ejected occupants in rollover crashes to the minor deployment-related injuries to out-of-position occupants in SDRCs is inconsistent with accepted engineering practices associated with any reasonable risk/benefit analysis. Moreover, the decision to elevate the risk to out-of-position occupants seated in the leading-side positions means that numerous passengers in vehicles with seating for 6 or 9 passengers – *i.e.*, occupants seated in the center and opposing-side seats -- would be deprived of any SABIC any protection in a SDRC. Whatever risk might exist for the out-of-position occupant on the leading-side of the vehicle does not exist for the occupants sitting in the middle seat and opposing-side seat. The decision to suppress all SABICs – leading-side and opposing-side – in a SDRC is even harder to explain in terms of rollover crash dynamics because the vehicle's roll precedes the occupants' motion and the vehicle roll-rate is initially faster than the occupants roll-rate.

44.     Chrysler devised its SABIC deployment logic in 2004 and began installing ORCs with rollover sensing capabilities in some of its vehicles in the 2006 model year.

45.    The SABIC deployment-based injury potential to Out-of-Position occupants was extensively researched by NHTSA. In 2007, NHTSA published a study concluding that the SABIC deployment injury potential to Out-of-Position occupants in a rollover was negligible. NHTSA reported:

> [T]his study uses the Hybrid III 3 year old, 6 year old and SID -II (5th percentile adult female side impact dummy) dummies in different OOP (Out-of-Position) test modes for all rows in the vehicle. The dummy responses from tests of side air curtains were all below the injury assessment reference values (IARVs)... [T]here were 54 tests conducted on eight vehicles with roof rail systems resulting in low response values (below 70% of all of the IARVs). Thirty-two tests were conducted with Hybrid II 3 year old and 6 year old dummies. Twenty-two of the tests were conducted with the SID II dummy. The 15ms HIC responses were negligible for all three dummies.

The NHTSA study was presented to industry executives and engineers at a Society of Automotive Engineers Government-Industry meeting in May 2007.

46.    Chrysler did not modify its logic to incorporate the findings of this NHTSA report. Instead, Chrysler continued to provide each of its ORC Suppliers with general algorithm requirement specifications that would suppress SABIC deployment in SDRCs and only deploy the SABICs in faster developing rollover crashes.

47.    Chrysler incorporated this SDRC deployment strategy throughout its vehicle, van, and truck models at a time when, on information and belief, no other automobile manufacturer in the industry was using such a design and deployment

strategy. The *de facto* industry standard, established by standardized use by all the other manufacturers, has been – for more than a decade -- to deploy the SABIC in *all* rollovers.

48.     Chrysler has had notice of dozens of consumer complaints filed with the National Highway Traffic Safety Administration between 2010 and today that Chrysler SABICs did not deploy in real-world rollover crashes. Some of these rollovers resulted in serious injuries and deaths. On information and belief, Plaintiffs allege that Chrysler has received direct notice from Chrysler customers and notice through its dealerships of many more non-deployment complaints.

49.     Vehicle rollovers are the cause, proportionately, of more deaths than any other type of crash.

50.     In evaluating the safety need for the adoption of FMVSS No. 226 (Ejection Mitigation),) NHTSA reported that rollover crashes are a significant and a particularly deadly safety problem. As a crash type, rollovers are second to frontal crashes as a source of fatalities in passenger vehicles. But the Final Rule on Federal Motor Vehicle Safety Standard ("FMVSS") No. 226 reported that a vehicle occupant in a rollover is *14 times more likely* to be killed than an occupant in a frontal crash.

51.     Ejection from the vehicle is a major cause of death and injury in rollover crashes. According to 2000-2009 FARS data, an average of 47% of the

occupants killed in rollovers were completely ejected from their vehicles. During this time, there were 358 fully ejected occupants killed for every 1000 fully ejected occupants in rollover crashes as compared to 14 of every 1000 not fully ejected occupants killed. This double pair comparison from the last 10 years of FARS data shows that preventing complete ejection is associated with a 64% decrease in the risk of death.

53. NHTSA has also found that:

- The majority of rollover crashes involve one or two quarter-turns.

- Most occupants are ejected through side windows.

- Ejection through side windows is the greatest contributory to the ejection problem.

52.    Thus, Chrysler's SABIC deployment logic fails to provide any protection to vehicle occupants in the majority of rollover crashes, leaving them vulnerable to death and injuries from ejection or head trauma.

### When Facing Government Scrutiny Over SABIC Deployment In Dodge Ram Pickups, Chrysler Changed Its Deployment Logic

53.    On May 9, 2017, NHTSA announced a recall of over one million (1,000,000) RAM pickups produced by FCA US, LLC because "Side Curtain Air Bags May Not Deploy in Rollover."

54.    The recall was prompted when Chrysler reported receiving complaints of RAM rollovers with non-deployment of SABICs.

55.    Chrysler advised NHTSA that these non-deployments were caused by off-road use that interfered with the alignment of sensors integrated in the OCR. The 2017 Recall stated that "[I]f the rollover side curtain air bags and safety-belt pretensioners are disabled, there is an increased risk of injury to the vehicle occupants in the event of a crash that necessitates activation of these safety systems."

56.    However, off-road use was only part of the cause. Plaintiffs allege that the root cause was Chrysler's deployment logic, which was set to suppress SABIC deployment in SDRCs. The remedy of the 2017 Recall provided that "Chrysler will notify owners, and dealers who will update the ORC software, free of charge." And thusly, Plaintiffs allege that Chrysler recalled and quietly fixed the factory-installed deployment logic in 1,000,000 Dodge Ram pickups.

57.    Around the time of the 2017 Recall, Chrysler adopted the *de facto* industry standard – SABIC deployment in all rollover crashes – and began phasing its historic deployment logic out of production across the fleet.

58.    Chrysler's abandonment of the SDRC deployment strategy has eliminated the deployment defect in future production but does nothing for over 8

million (8,000,000)[1] vehicles produced and sold between 2010 and 2017 (the Class Vehicles) that are equipped with the faulty and substandard SDRC deployment strategy.

### Chrysler Had Long Known That Its Deployment Logic Was Inconsistent With Government Research, Industry Standards, And Consumer Expectations

59.     Plaintiffs allege that Chrysler adopted its SABIC/SDRC deployment logic knowing that it would prevent deployment in the majority of real world rollovers.

60.     Chrysler knew or had to know that by suppressing SABIC deployment in SDRCs, it was knowingly exposing its owners and occupants to the very hazard that SABIC technology was intended to prevent or mitigate.

61.     Plaintiffs allege on information and belief that Chrysler has had extensive and continuing notice that its SABIC deployment logic provides less protection to vehicle occupants in the real world.

62.     Product liability lawsuits have been filed against Chrysler, asserting claims for deaths and injuries caused by the failure of Chrysler SABICs to deploy in rollover crashes. On information and belief, Chrysler has entered into

---

[1] Based on industry published sales figures between 2010 and 2017.

confidential settlements of such claims, Plaintiffs allege, in an effort to keep the defect hidden from public disclosure.

63.    Chrysler has received correspondence and other notices from vehicle owners and their family members expressing surprise, concern, and dissatisfaction that their SABICs did not deploy in rollover crashes. These consumers have expressed their belief that their SABICs should have deployed under such circumstances and therefore must have been defectively designed or manufactured. Chrysler has denied any defect, instead advising its customers that the SABICs performed as intended by Chrysler.

64.    On information and belief, Plaintiffs thus allege that before Plaintiffs purchased their respective Class Vehicles, Chrysler knew that its SABIC deployment logic was faulty through sources not available to consumers, including NHTSA research, industry standards, consumer complaints to Defendant and their dealers, and investigations conducted in response to those consumer complaints. Plaintiffs also allege that Chrysler knew that safety was a material consideration in purchasing a vehicle and that Chrysler vehicles would have suffered in comparison to Chrysler's competitors' vehicles had the faulty and substandard deployment logic been disclosed.

65.    Notwithstanding this knowledge, Chrysler misled Plaintiffs and Class Members about the faulty SABIC/SDRC deployment logic. Specifically,

Defendant failed to disclose or actively concealed from Plaintiffs and Class

Members, at and after the time of purchase that their SABICs would not deploy in

SDRCs. Instead, Chrysler:

      a.    depicted the SABIC in product literature and on window

              stickers as standard safety equipment that was part of a larger

              occupant restraint system;

      b.    did not disclose that the SABIC would not deploy in all rollover

              crashes and would not even deploy in the majority of rollover

              crashes;

      c.    did not disclose that Chrysler was unique among automakers in

              programming such limits into its ORCs.

66.    The existence of the faulty SABIC/SDRC deployment logic is a

material fact that a reasonable consumer would consider when deciding whether to

purchase a Class Vehicle.

67.    Reasonable consumers, like Plaintiffs, expect that a vehicle is safe,

compliant with all FMVSSs, will function in a manner that will not pose a safety

risk, is free from defects, and will provide reasonable protection for the occupants

in the event of a foreseeable rollover.

68.    Defendants have deprived Plaintiffs and Class Members of the benefit

of their bargain by overstating the safety of Chrysler vehicles and failing to

disclose the programmed limits of the SABIC equipment, thereby causing them to expend money to purchase vehicles that they would not have purchased or would have paid less for had they known of the faulty SABIC/SDRC logic.

## PLAINTIFFS' EXPERIENCES

69. Plaintiff David Johnson leased a new 2015 Chrysler 300 from Al Smith Chrysler in or about October 2015 for personal, family, and household use. He purchased the vehicle outright in or about December 2018. The safety of the vehicle was an important consideration in his decision to purchase because he had recently had twins and expected them to be frequent passengers. Mr. Johnson understood the vehicle to be equipped with a comprehensive airbag system that included side impact and rollover protection. Had he known that Chrysler deemed certain rollover crashes to be not serious or not severe and that the SABIC system was programmed to not deploy in the majority of rollover crashes, he would not have purchased the vehicle or would have paid substantially less for it.

70. Plaintiff Dennis Carnes purchased a new 2014 Dodge Caravan from Gary Miller CDJR in or about October 2014 for personal, family, and household use. The safety of the vehicle was an important consideration in his decision to purchase; he wanted the capacity for seven passengers and expected his grandchildren would be frequent passengers. Mr. Carnes understood the vehicle to be equipped with a comprehensive airbag system that included side impact and

rollover protection.  Had he known that Chrysler deemed certain rollover crashes to be not serious or not severe and that the SABIC system was programmed to not deploy in the majority of rollover crashes, he would not have purchased the vehicle or would have paid substantially less for it.

71.    Plaintiff Ron Humes purchased a Certified Pre-Owned 2016 Dodge 300C from John Elway's Claremont Chrysler Dodge Jeep Ram in or about May 2018 for personal, family, and household use. The safety of the vehicle was an important consideration in his decision to purchase and he understood the vehicle to be equipped with a comprehensive airbag system that included side impact and rollover protection.  Had he known that Chrysler deemed certain rollover crashes to be not serious or not severe and that the SABIC system was programmed to not deploy in the majority of rollover crashes, he would not have purchased the vehicle or would have paid substantially less for it.

72.    Plaintiff Lori Owen purchased a new 2016 Jeep Cherokee from Prescott Brothers Chrysler Dodge Jeep Ram of Mendota in or about November 2015 for personal, family, and household use. The safety of the vehicle was an important consideration in her decision to purchase because she expected to be driving it in winter weather. Ms. Owen understood the vehicle to be equipped with a comprehensive airbag system that included side impact and rollover protection. Had she known that Chrysler deemed certain rollover crashes to be not serious or

not severe and that the SABIC system was programmed to not deploy in the majority of rollover crashes, she would not have purchased the vehicle or would have paid substantially less for it.

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and/or (b)(2) and/or ( c)(4).

74.     Plaintiffs seek to represent the following Class (the "National Class"):

> All persons who purchased, for personal, family, or household purposes, one or more Chrysler vehicle manufactured during the model years 2010 through 2017 (inclusive) under the Chrysler, Dodge, or Jeep makes that was equipped with SABICs.

75.     Plaintiffs also seek to represent state subclasses for members of the National class who are residents of the states of California, Illinois, Ohio, and Pennsylvania.

76.     Class Vehicles are described as follows:

a.     All vehicles and light trucks manufactured by CHRYSLER in model years 2010 through 2017;

b.     That had rollover sensors;

c.     That had SABICs as part of the standard equipment;

d.     That were not convertibles; and

25

e.    That were not recalled and remedied in NHTSA Campaign No.

17V302000.

77.    Excluded from the Classes are Defendant, its employees, officers,

directors, legal representatives, heirs, successors, and wholly or partly owned

subsidiaries or affiliated companies; and the judicial officers and their immediate

family members and associated court staff assigned to this case. Also excluded

from the Classes are any individuals claiming damages from personal injuries

allegedly arising from the Class Vehicles.

78.    Plaintiffs reserve the right to modify or amend the definition of the

Classes before the Court determines whether certification is appropriate.

79.    Certification of Plaintiffs' claims for class-wide treatment is

appropriate because Plaintiffs can prove the elements of these claims on a class-

wide basis using the same evidence as would be used to prove those elements in

individual actions alleging the same claims.

**Numerosity**

80.    Members of the proposed Classes are so numerous that joinder of all

such members would be impracticable. On information and belief, there are

millions of Class Vehicles nationwide, and thousands of Class Vehicles in each

state. On information and belief, the Plaintiff Class includes more than 8 million

(8,000,000) owners. The individual Class Members are also ascertainable, as the

names and addresses of all Class Members can be identified in Defendant's books and records, as well as registration and sales records maintained by third parties.

## Commonality

81.    There are questions of law and fact that are common to all Plaintiffs' and Class Members' claims. These common questions predominate over any questions that go particularly to any individual member of the Classes. Among such common questions of law and fact are the following:

a.    Whether the Class vehicles are equipped with faulty and substandard SABIC/SDRC programming logic that suppresses deployment in SDRCs;

b.    Whether Defendant knew or should have known that the faulty and substandard SABIC/SDRC deployment logic was reducing vehicle safety and could cause preventable deaths and serious injuries;

c.    Whether Defendant knew or should have known that vehicle purchasers believed the SABIC system would protect them and occupants of their vehicles by deploying in all or nearly all rollover crashes;

d.    Whether Defendant engaged in unfair, deceptive, unlawful, and/or fraudulent acts by failing to disclose that the vehicles

27

were equipped with faulty and substandard SABIC/SDRC
deployment logic;

e.    Whether Defendant misrepresented that the vehicles equipped
with the faulty and substandard SABIC/SDRC deployment
logic were safe;

f.    Whether Defendant had a duty to disclose the faulty and
substandard SABIC/SDRC deployment logic to Plaintiffs and
other members of the proposed class;

g.    Whether Defendant omitted or failed to disclose material facts
that might affect Plaintiffs' and Class Members' decision to
purchase the Class vehicles;

h.    Whether a reasonable consumer would be likely to be misled by
Defendant's conduct;

i.    Whether the vehicles containing the faulty and substandard
SABIC/SDRC deployment logic were unfit for the ordinary
purpose for which they were purchased;

j.    Whether vehicles equipped with the faulty and substandard
SABIC/SDRC deployment logic failed to perform, or were
incapable of performing, according to consumer expectations of
safety;

28

k.      Whether Defendant has been unjustly enriched by its conduct;

l.      Whether Class Members over-paid for the Class vehicles containing faulty and substandard SABIC/SDRC deployment logic because that deployment logic suppresses deployment in SDRCs;

m.      Whether Plaintiffs and the Class are entitled to damages or equitable relief, including injunctive relief.

### Typicality

82.      Plaintiffs are members of the Classes they seek to represent. Plaintiffs' claims are typical of the Nationwide Class claims because of the similarity, uniformity, and common purpose of Defendant's unlawful conduct. Each Class Member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendant's wrongful conduct.

### Adequacy of Representation

83.      Plaintiffs are adequate representatives of the Class they seek to represent and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class litigation and experienced in consumer and product liability litigation related to automobile design, manufacturing, marketing, and sales to represent them. The undersigned law firms have the financial

resources to meet the litigation demands, including substantial costs, associated with these claims.

## Predominance

84.     Under Rule 23(b)(3), the questions of law or fact common to Plaintiffs' and Class Members' claims predominate over any questions of law or fact affecting only individual members of the Classes.

85.     Common issues predominate when, as here, liability can be determined on a class-wide basis.

86.     As set forth above, numerous common issues are presented here and will be determinative of Defendant's ultimate liability.

## Superiority

87.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

    a.    Joinder of all Class Members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

    b.    Individual claims by Class Members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual Class

Members have no interest in prosecuting and controlling separate actions;

c.     There are no known individual Class Members who are interested in individually controlling the prosecution of separate actions;

d.     The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum;

e.     Individual suits would not be cost effective or economically maintainable as individual actions; and

f.     The action is manageable as a class action.

**Requirements of Fed. R. Civ. P. 23(b)(2)**

88.     Defendant has acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

**COUNT 1**
**VIOLATIONS OF MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. § 2301, *ET SEQ.***
**(ON BEHALF OF THE NATIONWIDE CLASS OR ALTERNATIVELY**
**EACH OF THE STATE SUB-CLASSES)**

89.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

90.    The Magnuson-Moss Warranty Act ("MMWA") provides a private right of action by purchasers of consumer products against warrantors who, *inter alia*, fail to comply with the terms of a written or implied warranty. 15 U.S.C. § 2310(d)(1). As alleged herein, Chrysler has failed to comply with its express warranties and implied warranty of merchantability with regard to the Class Vehicles.

91.    The Class Vehicles are "consumer product[s]", as that term is defined in 15 U.S.C. § 2301(1).

92.    Plaintiffs and each member of the Classes defined above are "consumer[s]", as that term is defined in 15 U.S.C. § 2301(3).

93.    Chrysler is a "supplier" and "warrantor," as those terms are defined in 15 U.S.C. § 2301(4)-(5).

94.    The MMWA provides a cause of action for breach of a written or implied warranty or other violations of the Act. 15 U.S.C. § 2310(d)(1).

95.    Chrysler's warranties are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

96.    Chrysler breached the express warranties by providing a 3 year/36,000 mile Basic Limited Warranty with the purchase of all Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee; selling and leasing Class Vehicles programmed with

the faulty and substandard SABIC/SDRC deployment logic, and thus defective in

materials and/or workmanship, requiring repair or replacement within the warranty

period; and refusing and/or failing to honor the express warranties by effectively

repairing or replacing the SABIC free of charge and within a reasonable time.

97.    Chrysler also provided Plaintiffs and the other Class members with an

implied warranty of merchantability in connection with the purchase of their Class

Vehicles that is an "implied warranty" within the meaning of the MMWA, 15

U.S.C. § 2301(7). As part of the implied warranty of merchantability, Chrysler

warranted that the Class Vehicles were fit for their ordinary purpose as safe

passenger motor vehicles, would pass without objection in the trade as

manufactured and marketed, and were adequately contained, packaged, and

labeled.

98.    Chrysler breached these implied warranties and is therefore liable to

Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the

Class Vehicles were inadequately labeled as the Class Vehicles were presented to

consumers with window stickers and promotional brochures that described

Chrysler SABICs as standard safety equipment, did not disclose that the SABIC

was controlled by faulty and substandard deployment logic such that it would not

deploy in all rollover crashes and would not even deploy in the majority of rollover

crashes; and did not disclose that Chrysler differed from other automakers in designing and programming such limits into its ORCs.

99.     Chrysler has long known that its vehicles were equipped with SABICs that were faulty and has had a reasonable opportunity to cure. Chrysler failed to cure in that it has not offered to reprogram the faulty and substandard deployment logic for Plaintiffs and Class Members even though such reprogramming is feasible and would completely remedy the problem. Until Plaintiffs' representative capacity is determined, notice and opportunity to cure through Plaintiffs, and on behalf of the Class, can be provided under 15 U.S.C. § 2310(e).

100.   Chrysler's acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful. 15 U.S.C. §§ 2310(b), 45(a)(1).

101.   Plaintiffs and the members of the Class have suffered, and are entitled to recover, damages as a result of Chrysler's breach of express and/or implied warranties and violations of the MMWA.

102.   Plaintiffs also seek an award of costs and expenses, including attorneys' fees in connection with the commencement and prosecution of this action under 15 U.S.C. § 2310(d)(2). Plaintiffs and the prospective Class intend to

seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## COUNT 2
## FRAUDULENT CONCEALMENT
## (BROUGHT ON BEHALF OF THE NATIONWIDE CLASS)

103.    Plaintiffs incorporate by reference all of the allegations set forth above as if fully set forth herein.

104.    Plaintiffs bring this claim on behalf of members of the Nationwide Class.

105.    Defendant concealed and/or suppressed material facts concerning the safety of their vehicles. Defendant knew that the Class Vehicles were designed and manufactured with SABIC deployment programming that was faulty and substandard and would not even deploy the SABIC in the majority of rollover crashes, but Defendant concealed those material facts. Defendant recklessly manufactured and distributed the Class Vehicles to consumers in the United States, even though Defendant knew, or should have known, at the time of distribution, that the Class Vehicles contained the faulty and substandard SABIC/SRDC deployment logic. Plaintiffs and Class Members had no knowledge of this material information at the time they purchased the Class Vehicles.

106.    Defendant made material omissions and/or affirmative misrepresentations regarding the safety of their vehicles.

107.   The Class Vehicles purchased by Plaintiffs and Class Members were, in fact, unsafe because the vehicles contained faulty and substandard SABIC deployment programming.

108.   Defendant had a duty to disclose these safety issues to Plaintiffs, Class Members, the public, and NHTSA, but failed to do so.

109.   Defendant had a duty to disclose the true facts about the safety of the Class Vehicles because Defendant had superior knowledge and access to those facts, and the facts were not known or reasonably discoverable by Plaintiffs and Class Members. Defendant knew that Plaintiffs and Class Members had no knowledge of the faulty and substandard SABIC deployment programming in the Class Vehicles, and that neither Plaintiffs nor the other Class Members had an equal opportunity to discover the facts to inform them of the faulty and substandard SABIC deployment programming.

110.   Defendant had a duty to disclose that the Class Vehicles were defective, unsafe, and unreliable in that they contained faulty and substandard SABIC deployment programming because Plaintiffs and Class Members relied on Defendant's representations that the vehicles they were purchasing were as safe as represented and free from defects.

111.   The aforementioned concealment was material, because if it had been disclosed, Plaintiffs and Class Members would not have bought their vehicles or would have paid less for them.

112.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing a new or used motor vehicle. Defendant knew or recklessly disregarded that its representations and/or statements on the safety of the Class Vehicles were false.

113.   By misrepresenting and/or failing to disclose these material facts, Defendant intended to induce Plaintiffs and Class Members to purchase the Class Vehicles.

**COUNT 3**
**UNJUST ENRICHMENT**
**(BROUGHT ON BEHALF OF THE NATIONWIDE CLASS)**

114.   Plaintiff incorporates by reference all of the allegations set forth above as if fully set forth herein.

115.   Plaintiffs brings this claim on behalf of themselves and members of the Nationwide Class.

116.   Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the

defendant was unjustly enriched. At the core of each state's law are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state.

117.   Since there are no material conflicts relating to the elements of unjust enrichment between the different jurisdictions from which Class Members will be drawn, general unjust enrichment law principles apply to those claims.

118.   Plaintiffs and Class Members conferred a benefit on Defendant by purchasing the Class Vehicles.

119.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' purchases of the Class Vehicles equipped with the faulty and substandard SABIC deployment programming, which retention under these circumstances is unjust and inequitable because Chrysler actively concealed known flaws in the SABIC deployment programming, despite an obligation under applicable law and good conscience to disclose the existence of the flaws and to reprogram the faulty and substandard SABIC deployment system.

120.   Because Defendant's retention of the non-gratuitous benefit conferred on them by Plaintiffs and the Nationwide Class is unjust and inequitable,

Defendant should be required by the Court to pay restitution to Plaintiffs and the

Nationwide Class.

**Claims on Behalf of the California Sub-Class**
**Represented by Plaintiff Ronald Humes ("California Plaintiff")**

**COUNT 4**
**VIOLATIONS OF THE CALIFORNIA**
**CONSUMER LEGAL REMEDIES ACT CAL. CIV. CODE § 1750, *ET SEQ.***

121.   Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

122.   Plaintiff Humes ("California Plaintiff") brings this cause of action on

behalf of himself and on behalf of the members of the California Sub-Class against

Chrysler.

123.   Chrysler is a person as that term is defined in California Civil Code

§ 1761(c).

124.   Plaintiff Humes and the Sub-Class Members are "consumers" as that

term is defined in California Civil Code §1761(d).

125.   Chrysler engaged in unfair and deceptive acts in violation of the

California Consumer Legal Remedies Act ("CLRA") by the practices described

above, and by knowingly and intentionally concealing from Plaintiff and Sub-Class

Members that the Class Vehicles contained the faulty and substandard

SABIC/SDRC deployment logic (and the costs, risks, and diminished value of the

vehicles as a result of this problem). These acts and practices violate, at a

minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

126.   Chrysler's unfair or deceptive acts or practices occurred repeatedly in

Chrysler's trade or business, were capable of deceiving a substantial portion of the

purchasing public, and imposed a serious safety risk on the public.

127.   Chrysler knew that the Class Vehicles contained the faulty and

substandard SABIC/SDRC deployment logic and were not suitable for their

intended use.

128.   Chrysler was under a duty to Plaintiff and the Sub-Class Members to

disclose the faulty and substandard SABIC/SRDC deployment logic of the Class

Vehicles because:

a.   Chrysler was in a superior position to know the true state of

facts about the faulty and substandard SABIC/SRDC

40

deployment logic that affects vehicle safety and the dangers associated with the faulty and substandard SABIC/SRDC deployment logic in the Class Vehicles;

b.    California Plaintiff and the California Sub-Class Members could not reasonably have been expected to learn of or discover that the Class Vehicles contained faulty and substandard SABIC/SRDC deployment logic prior to purchase or even before experiencing a rollover;

c.    Chrysler knew that California Plaintiff and the California Sub-Class Members could not reasonably have been expected to learn or discover the faulty and substandard SABIC/SRDC deployment logic and the associated dangers.

129.   Chrysler actively concealed the faulty and substandard SABIC/SRDC deployment logic when confronted with non-deployment in actual rollover crashes. In some instances, Chrysler has blamed non-deployment of the SABIC on off-road use. In other instances, Chrysler has blamed non-deployment on driver error. And in other instances, Chrysler has simply stated – without further explanation -- that the SABIC system has performed as Chrysler intended.

130.    In failing to disclose its SABIC/SRDC deployment logic and the associated safety risks that result from it, Chrysler has knowingly and intentionally concealed material facts and breached its duty to disclose.

131.    The facts concealed or not disclosed by Chrysler to California Plaintiff and the California Sub-Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Chrysler's Class Vehicles or pay a lower price. Had California Plaintiff and the California Sub-Class Members known about the faulty and substandard SABIC/SRDC deployment logic, they would not have purchased the Class Vehicles or would have paid less for them.

132.    California Plaintiff's and the other California Sub-Class Members' injuries were proximately caused by Chrysler's fraudulent and deceptive business practices.

133.    Therefore, California Plaintiff and the California Sub-Class Members seek all relief available under the CLRA.

## COUNT 5
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
## CAL. BUS. & PROF. CODE § 17200

134.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

135.   California Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the California Sub-Class against Chrysler.

136.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

137.   Chrysler has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the California Sub-Class Members of the Class Vehicles' faulty and substandard SABIC/SRDC deployment logic and the associated safety risks. Chrysler should have disclosed this information because it was in a superior position to know the true facts related to the faulty and substandard SABIC/SRDC deployment logic, and California Plaintiff and California Sub-Class Members could not reasonably be expected to learn or discover the true facts related to the faulty and substandard SABIC/SRDC deployment logic.

138.   The faulty and substandard SABIC/SRDC deployment logic constitutes a safety issue because it causes the SABIC in Class Vehicles to fail to deploy in rollovers of one or two quarter turns of the vehicle, and as such, Chrysler had a duty to disclose the safety issue to consumers.

43

139.   These acts and practices have deceived California Plaintiff and the California Sub-Class Members and are likely to deceive the public. In failing to disclose the faulty and substandard SABIC/SRDC deployment logic and suppressing other material facts from California Plaintiff and the California Sub-Class Members, Chrysler breached its duties to disclose these facts, violated the UCL, and caused injuries to California Plaintiff and the California Sub-Class Members. The omissions and acts of concealment by Chrysler pertained to information that was material to California Plaintiff and the California Sub-Class Members, as it would have been to all reasonable consumers.

140.   The injuries suffered by California Plaintiff and the California Sub-Class Members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that California Plaintiff and the California Sub-Class Members should have reasonably avoided.

141.   Chrysler's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq*., and California Commercial Code § 2313.

142.   California Plaintiff and the California Sub-Class Members seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Chrysler, to obtain restitutionary disgorgement of all monies and revenues generated as a result

of such practices, and to obtain all other relief allowed under California Business & Professions Code § 17200.

**COUNT 6**
**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW**
**CAL. BUS. & PROF. CODE § 17500, *ET SEQ.***

143.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

144.    California Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the California Sub-Class against Chrysler.

145.    California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

146.    Chrysler caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the

45

exercise of reasonable care should have been known to Chrysler, to be untrue and misleading to consumers, including California Plaintiff and the other California Sub-Class Members.

147.    Chrysler has violated Section 17500 because the misrepresentations and omissions regarding the functionality and safety of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

148.    California Plaintiff and the other California Sub-Class Members have suffered an injury in fact, including the loss of money or property, as a result of Chrysler's unfair, unlawful, and/or deceptive practices. In purchasing their Class Vehicles, California Plaintiff and the other California Sub-Class Members relied on the misrepresentations and/or omissions of Chrysler with respect to the functionality and safety of the Class Vehicles. Chrysler's representations regarding SABIC were misleading because of the faulty and substandard SABIC/SRDC deployment logic. Had California Plaintiff and the other California Sub-Class Members known this, they would not have purchased their Class Vehicles and/or paid as much for them. Accordingly, California Plaintiff and the other California Sub-Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

149.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Chrysler's business. Chrysler's wrongful conduct is part of

a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

150.   California Plaintiff, individually and on behalf of the other California Sub-Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Chrysler from continuing its unfair, unlawful, and/or deceptive practices and to restore to California Plaintiff and the other California Sub-Class Members any money Chrysler acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT 7
## VIOLATIONS OF THE SONG-BEVERLY ACT (EXPRESS WARRANTY) CAL. CIV. CODE §§ 1792, 1791.1, *ET SEQ.*

151.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

152.   California Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the California Sub-Class against Chrysler.

153.   At all relevant times hereto, Chrysler was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Chrysler knew or should have known of the specific use for which the Class Vehicles were purchased.

47

154.   Chrysler made express warranties to California Plaintiff and the other California Sub-Class Members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

155.   Chrysler breached these warranties by selling Class Vehicles with faulty and substandard SABIC/SRDC deployment logic, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

156.   Chrysler has not promptly replaced or bought back the vehicles of Plaintiff and California Sub-Class Members.

157.   As a direct and proximate result of Chrysler's breach of its express warranties, California Plaintiff and the other California Sub-Class Members received goods whose condition substantially impairs their value to California Plaintiff and the other California Sub-Class Members. California Plaintiff and the other California Sub-Class Members have been damaged as a result of, *inter alia*, overpayment for and diminished value of the Class Vehicles due to the faulty and substandard SABIC/SDRC deployment logic.

158.   Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, California Plaintiff and the other California Sub-Class Members are entitled to damages and other

legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

159.   Pursuant to Cal. Civ. Code § 1794, California Plaintiff and the other California Sub-Class Members are entitled to costs and attorneys' fees.

## COUNT 8
## VIOLATIONS OF THE SONG-BEVERLY ACT (IMPLIED WARRANTY) CAL. CIV. CODE §§ 1792, 1791.1, ET SEQ.

160.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

161.   California Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the California Sub-Class against Chrysler.

162.   At all relevant times hereto, Chrysler was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Chrysler knew or should have known of the specific use for which the Class Vehicles were purchased.

163.   Chrysler provided California Plaintiff and the California Sub-Class members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles contained SABICs that will not deploy in the majority of rollovers because of the faulty and substandard SABIC/SRDC deployment logic.

164.   The Class Vehicles are not fit for the purpose of providing reliable and safe transportation because of the faulty and substandard SABIC/SRDC deployment logic.

165.   Chrysler impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Chrysler were reliable and safe for providing transportation and (ii) a warranty that the Class Vehicles would be fit for their intended use – providing reliable and safe transportation – while the Class Vehicles were being operated.

166.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are unsafe, as the Class Vehicles' SABICs do not deploy in the majority of rollovers due to the faulty and substandard SABIC/SRDC deployment logic.

167.   Chrysler's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## COUNT 9
## BREACH OF EXPRESS WARRANTY
## CAL. COM. CODE §§ 2313, 10210

168.    Plaintiffs incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

169.    California Plaintiff brings this cause of action on his own behalf and on behalf of the members of the California Sub-Class.

170.    Chrysler is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

171.    Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

172.    Chrysler provided all purchasers and lessees of the Class Vehicles with a Basic Limited Warranty ("the Warranty") containing several express warranties described herein, which became a material part of the bargain.

173.    In the Basic Limited Warranty, Chrysler agreed to repair, replace, or adjust all parts on the Class Vehicles that malfunction or fail during normal use due to a manufacturing defect in materials or workmanship for a period of up to 3 years or 36,000 miles, whichever comes first.

174.   Chrysler manufactured and/or installed all parts, including air bags, in the Class Vehicles; thus, the Class Vehicles and their component parts are covered by the express Warranty.

175.   The faulty and substandard SABIC/SDRC deployment logic at issue in this litigation was present at the time the Class Vehicles were sold to California Plaintiff and the California Sub-Class Members.

176.   Plaintiffs relied on Chrysler's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

177.   Under the express Warranties, Chrysler was obligated to correct the faulty and substandard SABIC/SDRC deployment logic in the vehicles owned by California Plaintiff and the California Sub-Class Members.

178.   Although Chrysler was obligated to correct the faulty and substandard SABIC/SDRC deployment logic, Chrysler did not.

179.   Chrysler breached the express Warranties by actively concealing the faulty and substandard SABIC/SRDC deployment logic when confronted with non-deployment in actual rollover crashes. In some instances, Chrysler has blamed non-deployment of the SABIC on off-road use. In other instances, Chrysler has blamed non-deployment on driver error. And in other instances, Chrysler has simply stated – without further explanation -- that the SABIC system has

performed as Chrysler intended. Chrysler did not, however, actually repair the Class Vehicles.

180. Chrysler has failed and refused to conform the SABIC and their deployment logic to the express Warranties. Chrysler's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

181. Moreover, Chrysler's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

182. The time limits contained in Chrysler's warranty period were also unconscionable and inadequate to protect California Plaintiff and the California Sub-Class Members. Among other things, California Plaintiff and the California Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Chrysler.

183. California Plaintiff and the California Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Chrysler's conduct described herein.

184. California Plaintiff and the California Sub-Class Members were not required to notify Chrysler of the breach because affording Chrysler a reasonable

opportunity to cure its breach of written warranty would have been futile. Chrysler was on notice of the faulty and substandard SABIC/SRDC deployment logic from the complaints received from vehicle owners, including dozens of consumer complaints filed with the National Highway Traffic Safety Administration since 2010 and through other internal and external sources.

185.   Because Chrysler has not remedied the faulty and substandard SABIC/SRDC deployment logic, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering such limitation null and void.

186.   As a direct and proximate cause of Chrysler's breach, California Plaintiff and the California Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of the value of their Class Vehicles.

187.   California Plaintiff and the California Sub-Class Members have been damaged in an amount to be determined at trial. Plaintiff and the other Class Members are entitled to legal and equitable relief against Chrysler, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**Claims on Behalf of the Illinois Sub-Class**
**Represented by Lori Owen ("Illinois Plaintiff")**

**COUNT 10**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**815 ILCS 50 5/1, *ET SEQ.*, 720 ILCS 295/1A**

188.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

189.    Plaintiff Lori Owen ("Illinois Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Illinois Sub-Class.

190.    Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

191.    Illinois Plaintiff and the Illinois Sub-Class Members are "consumers" as that term is defined in 815 ILCS 505/1(e).

192.    The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices that confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

193. Chrysler participated in deceptive trade practices that violated the Illinois CFA as described below and alleged throughout the Complaint, including by describing Chrysler SABICs as standard safety equipment in window stickers and promotional brochures presented to consumers; by not disclosing that the SABIC was controlled by faulty deployment logic such that it would not deploy in all rollover crashes and would not even deploy in the majority of rollover crashes; and by not disclosing that Chrysler differed from other automakers in designing and programming such limits into its ORCs.

194. By failing to disclose and concealing the faulty and substandard SABIC/SDRC deployment logic (under which the SABIC does not deploy in the majority of rollover crashes), Chrysler knowingly and intentionally omitted material facts in connection with the sale of the Class Vehicles. Chrysler systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and their faulty and substandard SABIC/SDRC deployment logic in the course of its business.

195. Chrysler engaged in unfair or deceptive practices prohibited by the Illinois CFA, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade

when they are not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

196. Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

197. Chrysler's unfair and deceptive acts or practices occurred repeatedly in Chrysler's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

198. Chrysler's methods of competition and unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

199. Chrysler knew that the Class Vehicles were programmed with faulty and substandard SABIC/SDRC deployment logic and were not suitable for their intended use.

200. Chrysler knew or should have known that its conduct violated the Illinois CFA.

201. Illinois Plaintiff and the Illinois Sub-Class Members reasonably relied on Chrysler's misrepresentations and omissions of material facts in their purchase of the Class Vehicles.

202.   Had Illinois Plaintiff and the Illinois Sub-Class Members known about the faulty and substandard SABIC/SDRC deployment logic, they would not have purchased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Chrysler's misconduct.

203.   Chrysler owed Illinois Plaintiff and the Illinois Sub-Class Members a duty to disclose the truth about the faulty and substandard SABIC/SDRC deployment logic because Chrysler: (a) possessed exclusive knowledge of the faulty and substandard SABIC/SDRC deployment logic; (b) intentionally concealed the foregoing from Illinois Plaintiff and the Illinois Sub-Class Members; and/or (c) made incomplete representations regarding the Class Vehicles' SABIC and the safety of the Class Vehicles, while purposefully withholding material facts from Illinois Plaintiff and the Illinois Sub-Class Members.

204.   Due to Chrysler's specific and superior knowledge that the SABIC/SDRC deployment logic was faulty and substandard and that the Class Vehicles' SABIC would not deploy in the majority of rollovers, its misleading representations regarding the Class Vehicles, and reliance by Illinois Plaintiff and the Illinois Sub-Class Members on these material representations, Chrysler had a duty to disclose to Class members the truth about SABIC/SRDC deployment logic and the associated safety risks that result from it. Having volunteered to provide information to Illinois Plaintiff and the Illinois Sub-Class Members, Chrysler had

the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased by Illinois Plaintiff and the Illinois Sub-Class Members. Safety is a material concern to Chrysler consumers.

205.   Illinois Plaintiff and the Illinois Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Chrysler's conduct, Illinois Plaintiff and the Illinois Sub-Class Members were harmed and suffered actual damages in the form of overpayment for and diminished value of their vehicles.

206.   As a direct and proximate result of Chrysler's unfair or deceptive acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

207.   Chrysler's violations present a continuing risk to Illinois Plaintiffs and the Illinois Sub-Class Members as well as to the general public. Chrysler's unlawful acts and practices complained of herein affect the public interest.

208.   Pursuant to 815 ILCS 505/10a(a), Illinois Plaintiff and the Illinois Sub-Class Members seek monetary relief against Chrysler in the amount of actual damages, as well as punitive damages because Chrysler acted with fraud and/or malice and/or was grossly negligent.

209.    Illinois Plaintiff and the Illinois Sub-Class Members also seek attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

## COUNT 11
## BREACH OF EXPRESS WARRANTY
## 810 ILL. COMP. STAT. §§ 5/2-313 AND 5/2A-210

210.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

211.    Illinois Plaintiff brings this cause of action on her own behalf and on behalf of the members of the Illinois Sub-Class.

212.    Chrysler is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

213.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

214.    Chrysler provided all purchasers of the Class Vehicles with a Basic Limited Warranty ("the Warranty") containing several express warranties described herein, which became a material part of the bargain.

215.    In the Basic Limited Warranty, Chrysler agreed to repair, replace, or adjust all parts on the Class Vehicles that malfunction or fail during normal use

due to a manufacturing defect in materials or workmanship for a period of up to 3 years or 36,000 miles, whichever comes first.

216.   Chrysler manufactured and/or installed all parts, including air bags, in the Class Vehicles; thus, the Class Vehicles and their component parts are covered by the express Warranty.

217.   The faulty and substandard SABIC/SDRC deployment logic at issue in this litigation was present at the time the Class Vehicles were sold to Illinois Plaintiff and the Illinois Sub-Class Members.

218.   Plaintiffs relied on Chrysler's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

219.   Under the express Warranty, Chrysler was obligated to correct the faulty and substandard SABIC/SDRC deployment logic in the vehicles owned by Illinois Plaintiff and the Illinois Sub-Class Members.

220.   Although Chrysler was obligated to correct the faulty and substandard SABIC/SDRC deployment logic, Chrysler did not.

221.   Chrysler breached the express Warranties by actively concealing the faulty and substandard SABIC/SRDC deployment logic when confronted with non-deployment in actual rollover crashes. In some instances, Chrysler has blamed non-deployment of the SABIC on off-road use. In other instances, Chrysler has blamed non-deployment on driver error. And in other instances, Chrysler has

simply stated – without further explanation -- that the SABIC system has performed as Chrysler intended. Chrysler did not, however, actually repair the Class Vehicles.

222.   Chrysler has failed and refused to conform the SABIC and its deployment logic to the express Warranties. Chrysler's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

223.   Moreover, Chrysler's attempt to disclaim or limit the express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

224.   The time limits contained in Chrysler's warranty period were also unconscionable and inadequate to protect Illinois Plaintiff and the Illinois Sub-Class Members. Among other things, Illinois Plaintiff and the Illinois Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Chrysler.

225.   Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the Warranty, or otherwise have been excused from performance of said obligations as a result of Chrysler's conduct described herein.

226.   Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify Chrysler of the breach because affording Chrysler a reasonable

opportunity to cure its breach of written warranty would have been futile. Chrysler was on notice of the faulty and substandard SABIC/SRDC deployment logic from the complaints received from vehicle owners, including dozens of consumer complaints filed with the National Highway Traffic Safety Administration since 2010 and through other internal and external sources.

227.   Because Chrysler has not remedied the faulty and substandard SABIC/SRDC deployment logic, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering such limitation null and void.

228.   As a direct and proximate cause of Chrysler's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles.

229.   As a direct and proximate result of Chrysler's breach of express warranties, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be determined at trial.

## COUNT 12
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## 810 ILL. COMP. STAT. §§ 5/2-314, 5/2A-212

230.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

231.   Illinois Plaintiff brings this cause of action on her own behalf and on behalf of the members of the Illinois Sub-Class.

232.   Chrysler is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

233.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

234.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

235.   Chrysler knew or had reason to know of the specific use for which the Class Vehicles were purchased. Chrysler directly sold and marketed the Class Vehicles to customers through authorized dealers, like those from whom Illinois Plaintiffs and the Illinois Sub-Class Members bought their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles. Chrysler knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and the Illinois Sub-Class Members.

236.   Chrysler provided Illinois Plaintiff and Illinois Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

237.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Chrysler were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

238.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Illinois Plaintiff and Illinois Sub-Class Members with safe transportation. Instead, the Class Vehicles are unsafe, as the Class Vehicles' SABICs do not deploy in the majority of rollovers due to the faulty and substandard SABIC/SRDC deployment logic. Chrysler knew that the Class Vehicles were programmed with faulty and substandard SABIC/SDRC deployment logic and were not suitable for their intended use.

239.    As a result of Chrysler's breach of the applicable implied warranties, Illinois Plaintiff and the Illinois Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

240.    Chrysler's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

241.   Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Chrysler's conduct described herein.

242.   Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify Chrysler of the breach because affording Chrysler a reasonable opportunity to cure its breach of written warranty would have been futile. Chrysler was on notice of the faulty and substandard SABIC/SRDC deployment logic from the complaints received from vehicle owners, including dozens of consumer complaints filed with the National Highway Traffic Safety Administration since 2010 and through other internal and external sources.

243.   As a direct and proximate cause of Chrysler's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles.

244.   As a direct and proximate result of Chrysler's breach of the implied warranty of merchantability, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be proven at trial.

**Claims on Behalf of the Ohio Sub-Class Represented by
Plaintiff David Johnson ("Ohio Plaintiff")**

**COUNT 13
VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
OHIO REV. CODE ANN. § 1345.01, *ET SEQ.***

245.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

246.    Plaintiff David Johnson ("Ohio Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Ohio Sub-Class.

247.    Ohio Plaintiff and the Ohio Sub-Class Members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 ("Ohio CSPA").

248.    Chrysler is a "supplier" as defined by the Ohio CSPA.

249.    Ohio Plaintiff's and the Ohio Sub-Class Members' purchases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

250.    The Ohio CSPA, Ohio Rev. Code Ann. § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio

Rev. Code Ann. § 1345.02. The CSPA also prohibits suppliers from advertising goods with the intent not to sell them as advertised and engaging in acts or practices that are otherwise unfair, misleading, false, or deceptive to consumers. *Id.* Defendant's conduct as alleged above and below constitutes unfair and unconscionable acts or practices in consumer sales transactions in violation of Ohio Rev. Code Ann. § 1345.02. By concealing that the Class Vehicles were programmed with the faulty and substandard SABIC/SDRE deployment logic, Chrysler participated in unconscionable acts and practices that violated the Ohio CSPA.

251.    Chrysler participated in misleading, false, or deceptive acts that violated the Ohio CSPA as described below and alleged throughout the Complaint. By describing Chrysler SABICs as standard safety equipment, by not disclosing and by concealing that the SABIC was controlled by faulty deployment logic (such that it would not deploy in all rollover crashes and would not even deploy in the majority of rollover crashes), and by not disclosing and by concealing that Chrysler differed from other automakers in designing and programming such limits into its ORCs, Chrysler knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. Chrysler systematically misrepresented, concealed, suppressed, or omitted material facts relating to the

Class Vehicles and their faulty and substandard SABIC/SDRC deployment logic in the course of its business.

252.   Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

253.   Chrysler's unfair and deceptive acts or practices occurred repeatedly in Chrysler's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

254.   Chrysler knew that the Class Vehicles were not suitable for their intended use.

255.   Chrysler knew or should have known that its conduct violated the Ohio CSPA.

256.   Ohio Plaintiff and the Ohio Sub-Class Members reasonably relied on Chrysler's misrepresentations and omissions of material facts in their purchase of the Class Vehicles.

257.   Had Ohio Plaintiff and the Ohio Sub-Class Members known about the faulty and substandard SABIC/SDRC deployment logic, they would not have

purchased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Chrysler's misconduct.

258.   Chrysler owed Ohio Plaintiff and the Ohio Sub-Class Members a duty to disclose the truth about the faulty and substandard SABIC/SDRC deployment logic because Chrysler: (a) possessed exclusive knowledge of the faulty and substandard SABIC/SDRC deployment logic; (b) intentionally concealed the foregoing from Ohio Plaintiff and the Ohio Sub-Class Members; and/or (c) made incomplete representations regarding the Class Vehicles' SABICs and the safety of the Class Vehicles, while purposefully withholding material facts from Ohio Plaintiffs and the Ohio Sub-Class Members.

259.   Due to Chrysler's specific and superior knowledge that the SABIC/SDRC deployment logic was faulty and substandard and that the Class Vehicles' SABICs would not deploy in the majority of rollovers, its misleading representations regarding the Class Vehicles, and reliance by Ohio Plaintiff and the Ohio Sub-Class Members on these material representations, Chrysler had a duty to disclose to Class members the truth about SABIC/SRDC deployment logic and the associated safety risks that result from it. Having volunteered to provide information to Ohio Plaintiff and the Ohio Sub-Class Members, Chrysler had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class

Vehicles purchased by Ohio Plaintiff and the Ohio Sub-Class Members. Safety is a material concern to Chrysler consumers.

260.   The Ohio Attorney General has made available for public inspection numerous state court decisions that have held that acts and omissions similar in type to those alleged here constitute deceptive sales practices in violation of the CSPA.

261.   Ohio Plaintiff and the Ohio Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Chrysler's conduct, Ohio Plaintiff and the Ohio Sub-Class Members were harmed and suffered actual damages in the form of overpayment for and diminished value of their vehicles.

262.   As a direct and proximate result of Chrysler's unfair or deceptive acts or practices, Ohio Plaintiff and the Ohio Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

263.   Defendant's violations present a continuing risk to Ohio Plaintiff and the Ohio Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

264.   Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining Chrysler's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Ohio CSPA as provided in Ohio Rev. Code Ann. § 1345.09.

## COUNT 14
## BREACH OF EXPRESS WARRANTY
## OHIO REV. CODE ANN. § 1302.26, *ET SEQ.*

265.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

266.    Ohio Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Ohio Sub-Class.

267.    Chrysler is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

268.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

269.    Chrysler provided all purchasers of the Class Vehicles with a Basic Limited Warranty containing several express warranties described herein, which became a material part of the bargain.

270.    In the Basic Limited Warranty, Chrysler agreed to repair, replace, or adjust all parts on the Class Vehicles that malfunction or fail during normal use due to a manufacturing defect in materials or workmanship for a period of up to 3 years or 36,000 miles, whichever comes first.

271.   Chrysler manufactured and/or installed all parts, including air bags, in the Class Vehicles; thus, the Class Vehicles and their component parts are covered by the express Warranty.

272.   The faulty and substandard SABIC/SDRC deployment logic at issue in this litigation was present at the time the Class Vehicles were sold to Ohio Plaintiff and the Ohio Sub-Class Members.

273.   Plaintiffs relied on Chrysler's express Warranty, which was a material part of the bargain, when purchasing or leasing their Class Vehicles.

274.   Under the express Warranty, Chrysler was obligated to correct the faulty and substandard SABIC/SDRC deployment logic in the vehicles owned by Ohio Plaintiff and the Ohio Sub-Class Members.

275.   Although Chrysler was obligated to correct the faulty and substandard SABIC/SDRC deployment logic, Chrysler did not.

276.   Chrysler breached the express Warranty by actively concealing the faulty and substandard SABIC/SRDC deployment logic when confronted with non-deployment in actual rollover crashes. In some instances, Chrysler has blamed non-deployment of the SABIC on by off-road use. In other instances, Chrysler has blamed non-deployment on driver error. And in other instances, Chrysler has simply stated – without further explanation -- that the SABIC system has

performed as Chrysler intended. Chrysler did not, however, actually repair the Class Vehicles.

277.   Chrysler has failed and refused to conform the SABICs and their deployment logic to the express Warranties. Chrysler's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

278.   Moreover, Chrysler's attempt to disclaim or limit the express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

279.   The time limits contained in Chrysler's warranty period were also unconscionable and inadequate to protect Ohio Plaintiff and the Ohio Sub-Class Members. Among other things, Ohio Plaintiff and the Ohio Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Chrysler.

280.   Ohio Plaintiff and the Ohio Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Chrysler's conduct described herein.

281.   Ohio Plaintiff and the Ohio Sub-Class Members were not required to notify Chrysler of the breach because affording Chrysler a reasonable opportunity to cure its breach of written warranty would have been futile. Chrysler was on

notice of the faulty and substandard SABIC/SRDC deployment logic from the

complaints received from vehicle owners, including dozens of consumer

complaints filed with the National Highway Traffic Safety Administration since

2010 and through other internal and external sources.

282. Because Chrysler has not remedied the faulty and substandard

SABIC/SRDC deployment logic, any limitation on remedies included in the

Warranty causes the Warranty to fail its essential purpose, rendering such

limitation null and void.

283. As a direct and proximate cause of Chrysler's breach, Ohio Plaintiff

and the Ohio Sub-Class Members suffered damages and continue to suffer

damages, including economic damages at the point of sale and diminution of value

of their Class Vehicles.

284. As a direct and proximate result of Chrysler's breach of express

warranties, Ohio Plaintiff and the Ohio Sub-Class Members have been damaged in

an amount to be determined at trial.

**COUNT 15**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**OHIO REV. CODE ANN. §§ 1302.27, 1310.19.**

285. Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

286.   Ohio Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Ohio Sub-Class.

287.   Chrysler is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

288.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

289.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ohio Rev. Code Ann. §§ 1302.27 and 1310.19.

290.   Chrysler knew or had reason to know of the specific use for which the Class Vehicles were purchased. Chrysler directly sold and marketed the Class Vehicles to customers through authorized dealers, like those from whom Ohio Plaintiff and the Ohio Sub-Class Members bought their vehicles, for the intended purpose of consumers purchasing the vehicles. Chrysler knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Ohio Plaintiff and the Ohio Sub-Class Members.

291.   Chrysler provided Ohio Plaintiff and Ohio Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

76

292.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Chrysler were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

293.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Ohio Plaintiff and Ohio Sub-Class Members with safe transportation. Instead, the Class Vehicles are unsafe, as the Class Vehicles' SABIC do not deploy in the majority of rollovers due to the faulty and substandard SABIC/SRDC deployment logic. Chrysler knew that the Class Vehicles were programmed with faulty and substandard SABIC/SDRC deployment logic and were not suitable for their intended use.

294.   As a result of Chrysler's breach of the applicable implied warranties, Ohio Plaintiff and the Ohio Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

295.   Chrysler's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ohio Rev. Code Ann. §§ 1302.27 and 1310.19.

296.    Ohio Plaintiff and the Ohio Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Chrysler's conduct described herein.

297.    Ohio Plaintiff and the Ohio Sub-Class Members were not required to notify Chrysler of the breach because affording Chrysler a reasonable opportunity to cure its breach of warranty would have been futile. Chrysler was on notice of the faulty and substandard SABIC/SRDC deployment logic from the complaints received from vehicle owners, including dozens of consumer complaints filed with the National Highway Traffic Safety Administration since 2010 and through other internal and external sources.

298.    As a direct and proximate cause of Chrysler's breach, Ohio Plaintiff and the Ohio Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles.

299.    As a direct and proximate result of Chrysler's breach of the implied warranty of merchantability, Ohio Plaintiff and the Ohio Sub-Class Members have been damaged in an amount to be proven at trial.

**Claims on Behalf of the Pennsylvania Sub-Class Represented by Plaintiff Dennis Carnes ("Pennsylvania Plaintiff")**

### COUNT 16
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 P.S. § 201-1, *ET SEQ.*

300.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

301.   Plaintiff Dennis Carnes ("Pennsylvania Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Pennsylvania Sub-Class.

302.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members purchased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

303.   All of the acts complained of herein were perpetrated by Chrysler in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

304.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d)

"Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). Chrysler engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

305.   Chrysler participated in unfair or deceptive trade practices that violated the Pennsylvania CPL as described below and alleged throughout the Complaint.

306.   By describing Chrysler SABICs as standard safety equipment, by not disclosing and by concealing that the SABIC was controlled by faulty deployment logic (such that it would not deploy in all rollover crashes and would not even deploy in the majority of rollover crashes), and by not disclosing and by concealing that Chrysler differed from other automakers in designing and programming such limits into its ORCs, Chrysler knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. Chrysler systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and their faulty and substandard SABIC/SDRC deployment logic in the course of its business.

307.   Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of the Class Vehicles.

308.   Chrysler's unfair and deceptive acts or practices occurred repeatedly in Chrysler's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

309.   Chrysler knew that the Class Vehicles were programmed with faulty and substandard SABIC/SDRC deployment logic and were not suitable for their intended use.

310.   Chrysler knew or should have known that its conduct violated the Pennsylvania CPL.

311.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members reasonably relied on Chrysler's misrepresentations and omissions of material facts in their purchase of the Class Vehicles.

312.   Had Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members known about the faulty and substandard SABIC/SDRC deployment logic, they would not have purchased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Chrysler's misconduct.

313.   Chrysler owed Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members a duty to disclose the truth about the faulty and substandard

SABIC/SDRC deployment logic because Chrysler: (a) possessed exclusive knowledge of the faulty and substandard SABIC/SDRC deployment logic; (b) intentionally concealed the foregoing from Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members; and/or (c) made incomplete representations regarding the Class Vehicles' SABICs and the safety of the Class Vehicles, while purposefully withholding material facts from Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members that contradicted these representations.

314.    Due to Chrysler's specific and superior knowledge that the SABIC/SDRC deployment logic was faulty and substandard and that the Class Vehicles' SABICs would not deploy in the majority of rollovers, its misleading representations regarding the Class Vehicles, and reliance by Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members on these material representations, Chrysler had a duty to disclose to Class members the truth about SABIC/SRDC deployment logic and the associated safety risks that result from it. Having volunteered to provide information to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members, Chrysler had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased by Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members. Safety is a material concern to Chrysler consumers.

315.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Chrysler's conduct, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members were harmed and suffered actual damages in the form of overpayment for and diminished value of their vehicles.

316.    As a result of Chrysler's conduct, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members were harmed and suffered actual damages as a result of Chrysler's misrepresentations and omissions.

317.    As a direct and proximate result of Chrysler's unfair or deceptive acts or practices, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

318.    Defendant's violations present a continuing risk to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

319.    Chrysler is liable to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members are also entitled to an award of punitive

damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT 17
## BREACH OF EXPRESS WARRANTY
## 13 PA. CONS. STAT. §§ 2313, 2A210

320.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

321.   Pennsylvania Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Pennsylvania Sub-Class.

322.   Chrysler is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

323.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

324.   Chrysler provided all purchasers of the Class Vehicles with a Basic Limited Warranty ("the Warranty") containing several express warranties described herein, which became a material part of the bargain.

325.   In the Basic Limited Warranty, Chrysler agreed to repair, replace, or adjust all parts on the Class Vehicles that malfunction or fail during normal use due to a manufacturing defect in materials or workmanship for a period of up to 3 years or 36,000 miles, whichever comes first.

326.    Chrysler manufactured and/or installed all parts, including air bags, in the Class Vehicles; thus, the Class Vehicles and their component parts are covered by the express Warranty

327.    The faulty and substandard SABIC/SDRC deployment logic at issue in this litigation was present at the time the Class Vehicles were sold to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members.

328.    Plaintiffs relied on Chrysler's express Warranty, which was a material part of the bargain, when purchasing their Class Vehicles.

329.    Under the express Warranty, Chrysler was obligated to correct the faulty and substandard SABIC/SDRC deployment logic in the vehicles owned by Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members.

330.    Although Chrysler was obligated to correct the faulty and substandard SABIC/SDRC deployment logic, Chrysler did not.

331.    Chrysler breached the express Warranty by actively concealing the faulty and substandard SABIC/SRDC deployment logic when confronted with non-deployment in actual rollover crashes. In some instances, Chrysler has blamed non-deployment of the SABIC on by off-road use. In other instances, Chrysler has blamed non-deployment on driver error. And in other instances, Chrysler has simply stated – without further explanation -- that the SABIC system has

performed as Chrysler intended. Chrysler did not, however, actually repair the Class Vehicles.

332.   Chrysler has failed and refused to conform the SABICs and their deployment logic to the express Warranties. Chrysler's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

333.   Moreover, Chrysler's attempt to disclaim or limit these express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

334.   The time limits contained in Chrysler's warranty period were also unconscionable and inadequate to protect Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members. Among other things, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Chrysler.

335.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have complied with all obligations under the Warranty, or otherwise have been excused from performance of said obligations as a result of Chrysler's conduct described herein.

336.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members were not required to notify Chrysler of the breach because affording Chrysler a

reasonable opportunity to cure its breach of written warranty would have been futile. Chrysler was on notice of the faulty and substandard SABIC/SRDC deployment logic from the complaints received from vehicle owners, including dozens of consumer complaints filed with the National Highway Traffic Safety Administration since 2010 and through other internal and external sources.

337.   Because Chrysler has not remedied the faulty and substandard SABIC/SRDC deployment logic, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering such limitation null and void.

338.   As a direct and proximate cause of Chrysler's breach, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles.

339.   As a direct and proximate result of Chrysler's breach of the express Warranty, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have been damaged in an amount to be determined at trial.

## COUNT 18
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## 13 PA. CONS. STAT. §§ 2314, 2A212

340.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

341.   Pennsylvania Plaintiff brings this claim on his own behalf and on behalf of the Pennsylvania Sub-Class.

342.   Chrysler is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

343.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

344.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. §§ 2314 and 2A212.

345.   Chrysler knew or had reason to know of the specific use for which the Class Vehicles were purchased. Chrysler directly sold and marketed the Class Vehicles to customers through authorized dealers, like those from whom Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members bought their vehicles, for the intended purpose of consumers purchasing the vehicles. Chrysler knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members.

346.   Chrysler provided Pennsylvania Plaintiff and Pennsylvania Sub-Class Members with an implied warranty that the Class Vehicles and their components

and parts are merchantable and fit for the ordinary purposes for which they were sold.

347.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Chrysler were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

348.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Pennsylvania Plaintiff and Pennsylvania Sub-Class Members with safe transportation. Instead, the Class Vehicles are unsafe, as the Class Vehicles' SABICs do not deploy in the majority of rollovers due to the faulty and substandard SABIC/SRDC deployment logic. Chrysler knew that the Class Vehicles were programmed with faulty and substandard SABIC/SDRC deployment logic and were not suitable for their intended use.

349.   As a result of Chrysler's breach of the applicable implied warranties, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

350.   Chrysler's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 13 Pa. Cons. Stat. §§ 2314 and 2A212.

351.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Chrysler's conduct described herein.

352.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members were not required to notify Chrysler of the breach because affording Chrysler a reasonable opportunity to cure its breach of warranty would have been futile. Chrysler was on notice of the faulty and substandard SABIC/SRDC deployment logic from the complaints received from vehicle owners, including dozens of consumer complaints filed with the National Highway Traffic Safety Administration since 2010 and through other internal and external sources.

353.   As a direct and proximate cause of Chrysler's breach, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles.

354. As a direct and proximate result of Chrysler's breach of the implied warranty of merchantability, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against the Defendant as follows:

A.     For an order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes and designating the undersigned as Class Counsel;

B.     For a declaration that Chrysler misrepresented the safety of its vehicles and specifically misrepresented or failed to disclose material facts about rollover safety and occupant protection in rollover crashes;

C.     For a declaration that the SABIC deployment programming in Class Vehicles does not conform to Chrysler's representations about safety and/or is faulty and substandard;

D.     For a declaration that the Defendant is financially responsible for notifying all Class Members about the faulty and substandard SABIC deployment programming nature of the Class Vehicles;

E.     For an order enjoining Defendant to desist from further deceptive practices with respect to the Class Vehicles, and directing Defendant to

permanently, expeditiously, and completely repair the Class Vehicles to eliminate the faulty and substandard SABIC deployment programming;

F.    For an award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties and damages, including interest, in an amount to be proven at trial;

G.    For a declaration that the Defendant must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits received from sale of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

H.    For an award of attorneys' fees and costs, as allowed by law;

I.    For an award of pre-judgment and post-judgment interest, as provided by law; and

J.    For such other relief as the Court may deem just and proper.

Dated: March 7, 2022

Respectfully submitted,

/s/ Victoria S. Nugent
Victoria S. Nugent
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., NW, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
vnugent@cohenmilstein.com

Theodore J. Leopold
COHEN MILSTEIN SELLERS &
TOLL PLLC
11780 U.S. Highway
1 North Suite N500
Palm Beach Gardens, FL 33408
Tel: (561) 515-1400
Fax: (561) 515-1401
tleopold@cohenmilstein.com

Samuel Cherry
Cherry and Irwin, P.C.
163 W. Main Street
Dothan, AL 36301
Tel: (334) 793-1000
Fax: (334) 699-7532
sam@cherryirwin.com

David Haynes
The Cochran Firm – D.C./Baltimore
1666 K Street, N.W., Suite 1150
Washington, D.C. 20006
(202) 682-5800
dhaynes@cochranfirmdc.com

Steven G. Calamusa FBN: 992534
Geoff S. Stahl FBN: 89240
GORDON & PARTNERS, P.A.
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
rgordon@fortheinjured.com
scalamusa@fortheinjured.com
SGC.pleadings@fortheinjured.com
gstahl@fortheinjured.com
GSS.pleadings@fortheinjured.com