UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DAVID JOHNSON, DENNIS CARNES, RONALD HUMES, and LORI OWEN, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FCA US, LLC,<br><br>Defendant. | Case No. 22-10494<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO DISMISS [27]**

Between 2011 and 2017, David Johnson, Dennis Carnes, Ronald Humes, and Lori Owen purchased vehicles manufactured by FCA US, LLC and equipped with Side Airbag Inflatable Curtains. FCA programmed the SABICs not to deploy in "slow-developing rollover crashes." So Plaintiffs believe the vehicles are not as safe as they could be. In fact, Plaintiffs say that they would not have purchased their vehicles—or would have paid less for them—had they known about the "deployment defect."

Plaintiffs sued FCA on behalf of themselves and all others similarly situated. In response, FCA moved to dismiss the complaint, arguing, among other things, that Plaintiffs lack standing to sue. Specifically, FCA argued that Plaintiffs have not suffered an injury-in-fact because the vehicles work exactly as programmed and because FCA was clear that a vehicle's airbags would only deploy as necessary.

The Court agrees and will grant the motion.

## I.

Before considering the particular vehicles at issue here, a brief explanation of the role Side Airbag Inflatable Curtains play in a vehicle's overall safety system, as alleged in the complaint, is in order.

In the event of a crash, a vehicle's "occupant-restraint controller" measures the vehicle's roll-rate and upward and forward acceleration in order to determine which safety features should deploy and in what manner. (ECF No. 25, PageID.1189.)[1] SABICs are one such safety feature, and they work in concert with the vehicle's front and side airbags, seatbelts, and pretensioners (i.e., the devices that tighten seatbelts during a crash) to protect occupants in a wide range of crash scenarios. (*Id.*) The occupant-restraint controller determines which of these safety features should deploy in a specific crash scenario based on the manufacturer's pre-programmed "deployment logic." (PageID.1188, 1195.)

SABICs play an important part in side-impact and rollover crashes. (PageID.1189.) These airbags are "stored in the roof rail area above each side window of the vehicle." (PageID.1190.) "Upon deployment, SABICs will launch downward to the base of the windowsill and inflate, creating a physical barrier [between the occupant and the] window . . . to prevent or mitigate . . . occupant ejection." (*Id.*) In addition, SABICs reduce head injuries by cushioning hard surfaces in the vehicle. (*Id.*)

---

[1] Unless otherwise specified, all citations are to the operative complaint, ECF No. 25.

Now consider the vehicles at issue here. Plaintiffs do not suggest that their vehicles lack SABICs or that their SABICs fail to deploy as programmed. (*See, e.g.*, PageID.1196, 1208.) Instead, they complain that the SABICs in their vehicles are intentionally programmed not to deploy in "slow-developing rollover crashes," meaning crashes that cause the vehicle to do one or two quarter turns and land on its side or roof. (PageID.1182, 1196.)

Plaintiffs acknowledge that airbags can themselves injure and kill vehicle occupants in low-speed crashes. (PageID.1197 ("The deployment injury potential of airbag technology was recognized by the auto industry as early as the late 1990s, when the deployment of front airbags in low-speed crashes caused the deaths of several dozen children and small adults.").) And they acknowledge that regulators, engineers, and automakers know that front airbags, at least, need "to be calibrated to the severity of the crash . . . including no deployment in very low-speed crashes." (*Id.*)

But Plaintiffs think FCA made the wrong call about SABIC deployment in slow-developing rollover crashes. First, they say—on information and belief—that every other automaker programmed their SABICS to deploy in all rollover crashes. (PageID.1196.) Second, they argue that FCA miscalculated the costs and benefits of SABIC deployment in these crashes. They say that FCA based its decision on the wrongheaded conclusion that "the risk of injury to out-of-position occupants—*i.e.*, occupants who are not upright, front-facing, and restrained—in a [slow-developing rollover crash] would exceed the benefits that a deployed [SABIC] would provide[.]"

3

(PageID.1196.) Put differently, Plaintiffs acknowledge that FCA intentionally programmed the SABICs not to deploy in this crash scenario in an effort to protect out-of-position occupants from the danger a deployed SABIC might pose to them. But they believe that this decision "is inconsistent with accepted engineering practices associated with any reasonable risk/benefit analysis." (PageID.1197.)

While acknowledging that they have never suffered any injuries, Plaintiffs believe that FCA's SABIC-deployment logic "has denied and continues to deny vehicle owners . . . the safety benefits of SABIC technology . . . and increases the risk of death or injury to the occupants." (PageID.1183.) Even worse, say Plaintiffs, because slow-developing rollover crashes make up the "majority of rollover crashes," the defect deprives them of disproportionate protection from injury. (*Id.*) Accordingly, each named plaintiff alleges that had he or she known that FCA "deemed certain rollover crashes to be not serious or not severe and that the SABIC system was programmed to not deploy in the majority of rollover crashes, [they] would not have purchased the vehicle or would have paid substantially less for it." (PageID.1206–1207.)

So they sued FCA on behalf of themselves and all others similarly situated. (*See generally* ECF No. 1.) They bring 18 claims under the laws of the United States and of California, Illinois, Ohio, and Pennsylvania. (*Id.*) The complaint defines the class vehicles as "all vehicles and light trucks" made by FCA between 2011 and 2017 that had rollover sensors and SABICs as part of their standard equipment. (PageID.1208.) But any individuals "claiming damages from personal injuries" allegedly arising from the class vehicles are excluded from the class. (PageID.1209.)

4

For its initial response, FCA moved to dismiss the complaint. (ECF No. 27.) It argues that the Court lacks subject-matter jurisdiction over the case under Federal Rule of Civil Procedure 12(b)(1) and that Plaintiffs failed to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). The motion is now fully briefed. (ECF Nos. 30, 31.) Given the adequate briefing, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II.

The Court begins, as it must, with FCA's challenge to its subject-matter jurisdiction. *See Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007) ("Subject matter jurisdiction is always a threshold determination.").

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Crugher v. Prelesnik*, 761 F.3d 610, 613 (6th Cir. 2014) (citing *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005)). A facial attack tests the pleading's sufficiency, not the veracity of its allegations. *Stout v. United States*, 721 F. App'x 462, 465 (6th Cir. 2018). But a factual challenge requires the district court to "weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter." *Bowers v. Wynne*, 615 F.3d 455, 457 (6th Cir. 2010) (citing *Golden*, 410 F.3d at 887).

Because FCA takes Plaintiffs' factual allegations as true, the Court will follow suit and construe its motion as a facial attack on the Court's subject-matter jurisdiction. (*See generally* ECF No. 27.)

5

## III.

"Standing is a jurisdictional requirement. . . . If no plaintiff has standing, then the court lacks subject-matter jurisdiction" over the case. *State by & through Tennessee Gen. Assembly v. United States Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019). The plaintiff has the burden of establishing standing and, at the pleading stage, must "clearly allege facts demonstrating each element" of standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). To have standing, a plaintiff "must have suffered an injury-in-fact that is fairly traceable to the defendant's conduct and would likely be redressed by a favorable decision from a court." *Bouye v. Bruce*, — F.4th —, No. 21-6195, 2023 WL 2301473, at *3 (6th Cir. Mar. 1, 2023) (citing *Rice v. Vill. of Johnstown*, 30 F.4th 584, 591 (6th Cir. 2022)). To establish an injury-in-fact, a plaintiff must show that she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Importantly, no plaintiff claims to have an injury-in-fact because of SABIC nondeployment in an actual or imminent slow-developing rollover crash. (PageID.1209; ECF No. 30, PageID.1354.) And no plaintiff claims to have an injury-in-fact because their SABIC malfunctioned or otherwise failed to conform to FCA's specifications. (*See generally* ECF No. 25.) Instead, Plaintiffs argue that they have suffered an injury-in-fact because FCA "deprived [them] of the benefit of their bargain by overstating the safety of [FCA] vehicles and failing to disclose the programmed limits of the SABIC equipment, thereby causing them to expend money to purchase

6

vehicles that they would not have purchased or would have paid less for had they known of the faulty [deployment] logic." (ECF No. 25, PageID.1205–1207; *see also* ECF No. 30, PageID.1354.)

Plaintiffs start off well enough. Their "overpayment theory" can be sufficient to establish standing. Indeed, the "prevailing jurisprudence in this district . . . holds that a consumer who alleges she would not have purchased a vehicle (or would have paid less for it) had the manufacturer not misrepresented the vehicle to customers' detriment or omitted mention of its significant limitations, has alleged a plausible injury-in-fact." *See Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 694 (E.D. Mich. 2020); *see also Crawford v. FCA US LLC*, No. 2:20-CV-12341, 2021 WL 3603342, at *2 (E.D. Mich. Aug. 13, 2021); *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013).

Even so, a plaintiff must "clearly allege facts" showing that they suffered an overpayment injury. *See Spokeo*, 578 U.S. at 338. These plaintiffs have not. Simply put, Plaintiffs failed to allege that FCA deprived them of the benefit of their bargain by making misrepresentations or omissions about the SABIC-deployment logic.

A close look at the complaint reveals where Plaintiffs' injury is lacking. Plaintiffs say that in the "promotional brochures and . . . window stickers that accompanied [FCA] vehicles, [FCA] . . . depicted its SABIC system as standard equipment that was one safety component in a comprehensive crashworthiness and occupant protection system." (PageID.1183–1184.) But, say Plaintiffs, these materials contained "affirmative misrepresentations" and "omissions."

7

(PageID.1191–1194.) A few examples are illustrative. "The 2012 Jeep Compass was promoted as [having] 'Advanced multistage front and side-curtain air bags. These air bags provide nearly instantaneous occupant protection by matching air bag output to crash severity.'" (PageID.1191.) "The 2012 Jeep Grand Cherokee promised 'A SAFE, SECURE AIR BAG SYSTEM. Always standard: full-length side-curtain, seat-mounted side thorax, and advanced multistage front air bags all work in tandem to help provide protection.'" (PageID.1191–1192.) "The 2012 Chrysler Town & Country was promoted as 'A minivan that offers an advanced safety and technology package like no other in its class' with 'Forty-two available active and passive safety and technology features' including 'supplemental side curtain airbags [that] extend protection to all outboard front- and rear-seat passengers, including third-row outboard passengers. Upon side impact, the system deploys the specific side airbag required for occupant protection." (PageID.1192–1193.)

Crucially, none of the statements listed in the complaint say anything at all about *when* the SABICs would deploy or suggest that they would deploy in all rollover crashes. (PageID.1191–1194.) In fact, FCA was explicit that a vehicle's airbags would deploy as (and if) necessary. (*See, e.g.*, PageID.1191 ("These air bags provide nearly instantaneous occupant protection by matching air bag output to crash severity."); 1191–1192 (noting that the airbags "all work in tandem to help provide protection"); 1192–1193 ("Upon side impact, the system deploys *the specific side airbag* required for occupant protection." (emphasis added)).) And Plaintiffs acknowledge that regulators, engineers, and automakers know that front airbags, at least, need "to be

8

calibrated to the severity of the crash . . . including no deployment in very low-speed crashes." (*Id.*) So it appears that Plaintiffs' own allegations show that FCA did not mislead them into thinking that its SABICs would deploy in all rollover crashes.

Put differently, it is not clear what factual allegations support Plaintiffs' claim that FCA "deprived [them] of the benefit of their bargain by overstating the safety of [FCA] vehicles and failing to disclose the programmed limits of the SABIC equipment[.]" (*See* ECF No. 25, PageID.1205–1207.) Plaintiffs point to no promises by FCA that the SABICs would always deploy in rollover crashes. And they admit that FCA told them that their vehicle would only deploy "the specific side airbag required for occupant protection" and that their airbags work "in tandem to help provide protection." (PageID.1192–1193.) So Plaintiffs' "alleged injury-in-fact is premised on the loss of a 'safety' benefit that was not part of the bargain to begin with." *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009).

On these factual allegations, Plaintiffs received what they were promised. In Plaintiffs' own words, "in the promotional brochures and on the window stickers that accompanied [FCA] vehicles, [FCA] described and depicted its SABIC system as standard equipment that was one safety component in a comprehensive crashworthiness and occupant protection system." (PageID.1183–1184.) Plaintiffs received that benefit in their bargain with FCA. So there is no plausible overpayment injury-in-fact here.

Rather than identify the factual allegations that support the assertion that Plaintiffs' preferred SABIC-deployment logic was a benefit of their bargain with FCA,

9

Plaintiffs attempt to pair their contract-based injury-in-fact with tort-based factual allegations. Indeed, Plaintiffs repeatedly suggest that their vehicles are unsafe and that the SABICs are "defective," despite explicitly disclaiming the risk of physical harm as an injury-in-fact. (*See, e.g.*, PageID.1183 (arguing that the SABIC-deployment logic "increases the risk of death or injury to [class vehicle] occupants"); PageID.1197, 1203 (complaining that the "deployment defect" is "inconsistent with . . . any reasonable risk/benefit analysis" and contrary to "government research, industry standards, and consumer expectations").) This creates an untenable dissonance: "The wrongs [Plaintiffs] allege—[the] sale of a defective product—are products liability claims . . . . Yet, the damages they assert—[the] benefit of the bargain . . . —are contract law damages." *See Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 320–21 (5th Cir. 2002). "The plaintiffs apparently believe that if they keep oscillating between tort and contract law claims, they can obscure the fact that they have asserted no concrete injury. Such artful pleading, however, is not enough to create an injury in fact." *Id.* In fact, courts routinely dismiss these so-called "no-injury products-liability cases" for lack of standing. *See Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1281 (C.D. Cal. 2016) (collecting cases).

The dissonance between the factual allegations and the alleged injury-in-fact is laid bare by the nature of the SABIC "defect." A product is "defective" within the meaning of products-liability law if it harms persons or property. *See, e.g.*, Restatement (Third) of Torts: Prod. Liab. § 1 (March 2023 Update) (explaining principle and collecting cases from California, Illinois, and Pennsylvania); *see also*

10

*HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1030 (6th Cir. 2003) (explaining similar requirement under Ohio law). And a product is sometimes called "defective" within consumer-fraud or contract law if it malfunctions or fails to do what its manufacturer promised it would. *See, e.g.*, *Pack v. Damon Corp.*, 434 F.3d 810, 814–15 (6th Cir. 2006) (considering "defects" in motor home—including rust, loose gaskets, and various malfunctioning electrical components—under the Uniform Commercial Code); *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 917 (8th Cir. 2008) (calling a windshield-wiper module "defective" because it suddenly stopped working); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 353 (N.D. Cal. 2018) (noting that plaintiffs called an internet modem "defective" because "it did not offer as fast and as reliable an Internet connection as advertised"). Though Plaintiffs' complaint uses the word "defect" more than a dozen times, the SABICs do not fit within either meaning of the word. This suggests that Plaintiffs have not suffered an "invasion of a legally protected interest" under either contract or tort law. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Instead, Plaintiffs suggest that the SABICs were "defective" because, in Plaintiffs' opinion, they might have provided more safety with different programming. But Plaintiffs cannot have suffered an injury-in-fact merely because they purchased a vehicle that could be safer—at least where, as here, there are insufficient factual allegations supporting a breach-of-contract or tort injury. *See Flynn v. FCA US LLC*, No. 15-CV-855, 2020 WL 1492687, at *4 (S.D. Ill. Mar. 27, 2020), *aff'd as modified,* 39 F.4th 946 (7th Cir. 2022). "Theoretically, any product can

11

be made safer or better—there are no foolproof products. The fact that the [vehicle] has vulnerabilities and could have been made safer does not make it defective when no [class] vehicles have ever manifested the alleged defect." *Id.*; *see also Lesho v. Textron, Inc.*, 408 F. Supp. 2d 329, 335 (E.D. Mich. 2005) ("[S]imply because the product does not incorporate features that would make it safer, does not mean that the product is necessarily unsafe."). Without more, "Plaintiffs do not have standing." *Id.*

One case FCA relies on reveals the deficiencies with Plaintiffs' alleged injury-in-fact. (ECF No. 27, PageID.1306.) In *Lassen v. Nissan North America, Inc.*, a class of vehicle owners sued a number of car manufacturers because of problems with their vehicles' "keyless fob system." 211 F. Supp. 3d 1267, 1272 (C.D. Cal. 2016). Essentially, the keyless-fob system permitted a driver to start the vehicle at the press of a button if the fob was in the vehicle, but the system did not turn the vehicle off when the fob was removed from the vehicle. *Id.* This meant that drivers could inadvertently leave their vehicles running, which created a risk of carbon-monoxide poisoning if the vehicle was left running in an enclosed space. *Id.* So the plaintiffs sued, arguing that the keyless-fob system "should be equipped with an auto-off feature." *Id.* at 1273. They brought claims for consumer fraud, unjust enrichment, and breaches of the implied warranty of merchantability under the laws of various states. *Id.* at 1271–72.

The *Lassen* court rejected the plaintiffs' argument that they had suffered an overpayment injury-in-fact and dismissed the case. 211 F. Supp. 3d at 1283. Though

12

the plaintiffs there claimed to have overpaid for their vehicles, the court concluded that "all of Plaintiffs' claims depend on the Automakers selling them a defective product, [but] this is not a products liability action" because no persons or property had been harmed. *Id.* at 1280. And, as is the case here, the court noted that the plaintiffs cited "no cases in which a product that worked as intended could support consumer fraud claims for failure to disclose a defect. Rather, each consumer fraud case . . . involved a product malfunction or failure." *Id.* at 1283. Accordingly, the court concluded that the plaintiffs' "allegations that they overpaid are untenable and cannot establish standing to pursue their consumer fraud claims." *Id.* at 1284

And *Lassen* does not stand alone. "It is well-established that a purchaser of a product who receives the benefit of his bargain has not suffered Article III injury-in-fact traceable to the defendant's conduct," even where the purchaser wanted or expected a safer product. *See Barakezyan v. BMW of N. Am., LLC*, No. CV-1600173, 2016 WL 2840803, at *4 (C.D. Cal. Apr. 7, 2016). *See also Rivera*, 283 F.3d at 320 (finding no standing because "[b]y plaintiffs' own admission, Rivera paid for an effective pain killer, and she received just that—the benefit of her bargain[,]" even if the painkiller might have been safer with more warnings); *Aleisa v. GOJO Indus., Inc.*, 538 F. Supp. 3d 764, 773 (N.D. Ohio 2021) (finding no standing because "Plaintiffs have not suffered an injury. They received fair value for what they paid. They paid for hand sanitizer. They received hand sanitizer."); *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 747 (E.D. Mich. 2017) (finding no standing because "Beck is claiming that he suffered economic harm because his vehicle [did not include] an

13

auto-park safety feature—a feature that was neither expected nor part of the bargain[.]"); *Schoelwer v. Omega Flex, Inc.*, No. 1:14-CV-360, 2014 WL 7185295, at *10 (S.D. Ohio Dec. 16, 2014) (finding no standing because plaintiff "has not alleged that the product failed to perform its intended use, to transmit natural gas in her home. This distinguishes Schoelwer's claims from those involving defective consumer products, such as moldy washing machines[.]" (citing *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013))).).

Read together, these cases reject standing where "plaintiffs alleged that a product was defective for lack of an unbargained-for safety feature, yet the plaintiffs' theory of injury was not based on physical harm, but rather on economic harm . . . . [A]t the center of the reasoning in [these cases] is a discomfort with no-injury products liability actions being tried as consumer fraud cases." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 352 (N.D. Cal. 2018).

This is just such a case. Plaintiffs think their SABICs should be programmed to deploy in all rollover crashes. (*See* PageID.1217 (arguing that "reprogramming" the SABICs "is feasible and would completely remedy the problem").) But because the SABICs work as designed and as promised and because they have not harmed any putative class members, Plaintiffs were not injured by FCA's decision not to implement their preferred programming. Accordingly, they lack standing.

## IV.

In sum, Plaintiffs could not have purchased their vehicles based on any promises that the SABICs would deploy in all rollover crashes because FCA made no such promises. Instead, FCA was clear that a vehicle's airbags would only deploy as

14

(and if) needed. So "Plaintiffs were entitled to expect that the suite of features included with their vehicles would function as designed; the Complaint[] reveal[s] that that is what Plaintiffs received . . . . Plaintiffs make no allegation that the [SABICs] malfunction or fail. Thus, Plaintiffs' allegations that they overpaid are untenable and cannot establish standing." *See Lassen*, 211 F. Supp. 3d at 1284.

Accordingly, the Court GRANTS FCA's motion to dismiss (ECF No. 25) and DISMISSES the case. Plaintiffs' motion to appoint interim class counsel (ECF No. 16) is DENIED as moot. A separate judgment will follow.

SO ORDERED.

Dated: March 20, 2023

                                                s/Laurie J. Michelson
                                                LAURIE J. MICHELSON
                                                UNITED STATES DISTRICT JUDGE